UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALTER DOMUS, LLC,

               Plaintiff and Counter-Defendant,          Case Number 23-10458

v.                                                   Honorable David M. Lawson

LARRY J. WINGET and JVIS-USA, LLC,

               Defendants and Counter-Plaintiffs,

_____/

## OPINION AFTER TRIAL

In 2008, JPMorgan Chase Bank, NA filed a lawsuit in its capacity as administrative agent to enforce a Guaranty Agreement signed by defendant Larry J. Winget and his trust. That lawsuit eventually resulted in a substantial judgment against Winget and his trust that was entered in 2015 and subsequently amended in 2018. Plaintiff Alter Domus LLC assumed Chase's role as administrative agent and has been trying to collect on it from the assets of Winget's trust. One of the assets of the Trust is its membership interest in a limited liability company, defendant JVIS-USA, LLC. That entity had issued promissory notes in 2017 totaling $150 million. Through the collection litigation in the 2008 case, the notes have found their way into the hands of plaintiff Alter Domus as holder. The notes are past due, and Alter Domus has brought the present action to enforce them. In addition, Alter Domus alleges that defendant Winget amended the notes during a period when they should have belonged to Winget's trust but before Alter Domus's predecessor took possession of them, and those amendments amount to fraudulent transfers. The defendants dispute these claims, and they counter that the notes are invalid because JVIS-USA was insolvent at the time it distributed them. They also contend that Alter Domus does not have standing to assert its claims.

The matter proceeded to a bench trial on February 18 through 21, 2025, before the Court sitting without a jury. Five witnesses testified in person and the Court received 77 exhibits. The parties also designated for admission certain deposition excerpts. Afterward, the parties submitted proposed findings of fact, and their proposed conclusions of law were presented in their post-trial briefs.

The following constitutes the Court's findings of fact under Federal Rule of Civil Procedure 52(a)(1), based on the record evidence, followed by its application of the governing law.

I. Factual Findings

A. Background

The background facts are largely uncontested and are based on the parties' pretrial stipulations. *See* Joint Final Pretrial Order, ECF No. 248, PageID.3704-08. This case is an outgrowth of a lawsuit brought by JPMorgan Chase Bank, NA, to enforce a Guaranty that obligated Larry J. Winget and the Larry J. Winget Living Trust to cover a debt incurred by Venture Holdings Company, LLC, an entity controlled by defendant Larry J. Winget, in exchange for forbearance on a defaulted loan. That lawsuit resulted in a substantial judgment entered in 2015 against Winget and the Trust. *See JPMorgan Chase Bank v. Winget*, No. 08-13845 (E.D. Mich.), ECF Nos. 568, 823. The judgment was based on a finding that the Winget Trust is separately liable under the Guaranty that Winget executed with a predecessor interest of JPMorgan Chase Bank, in its capacity as administrative agent for a group of lenders.

Winget's part of the judgment effectively was satisfied, and shortly thereafter, Chase began its collection efforts against the Trust. Unbeknownst to Chase, however, Winget in 2014 had revoked the Trust and removed all of its assets. Winget revealed the revocation in October of 2015 when he sought a declaratory judgment, filed as a separate action, that would establish that, with

the revocation, Chase had no further recourse against him or the assets that were once held in the Trust. That lawsuit was assigned case number 15-13469 (E.D. Mich.). Chase filed counterclaims alleging that the revocation was a constructively fraudulent transfer under the Michigan Uniform Voidable Transactions Act (MUVTA) and that Winget was unjustly enriched by the revocation. Because the Court concluded that the relief sought in Chase's counterclaims was the "functional equivalent of post-judgment proceedings" in the 2008 case, it consolidated the cases. The parties and the Court frequently have referred to the claims and counterclaims in the 2015 case number as the "Avoidance Action." Chase then moved for judgment on the pleadings on its fraudulent transfer claim. The Court agreed with Chase and granted its motion as to liability only. Winget did not immediately appeal that ruling. Rather, he rescinded his revocation and retitled to the Trust all property that it held at the time of the revocation.

After Winget reinstated the Trust, Chase requested entry of Charging Orders with respect to membership interests in certain limited liability companies (LLCs) held by the Trust, including defendant JVIS-USA. The Court issued the requested Charging Orders on August 15, 2019, and the Sixth Circuit affirmed. *JPMorgan Chase Bank, N.A. v. Winget*, 942 F.3d 748, 750 (6th Cir. 2019).

The Trust was the sole member of defendant JVIS-USA, LLC until 2016, when Winget retitled the Trust's membership in JVIS-USA to make himself and a new grantor retained annuity trust (the "GRAT") the members of the LLC, with Winget possessing 10 Class A voting shares and the GRAT possessing 90 Class B non-voting shares. After Winget was called out on that action in court decisions, he rescinded his revocation and retitled all the property to the Trust, including the interests in certain limited liability companies, which included JVIS-USA.

-3-

Before the retitling, however, JVIS-USA distributed hundreds of millions of dollars in cash and promissory notes to Winget and the GRAT.  On June 29, 2017, JVIS issued a promissory note to the GRAT for $135 million and one to Winget personally for $15 million.  When Winget reinstated the Trust, he did not return the promissory notes to the Trust but rather dissolved the GRAT and assigned the $135 million note to himself.  After motion practice regarding the disposition of the distributions in the 2008 case, the Court granted the Agent summary judgment and ordered the imposition of a constructive trust over the distributions, including the $150 million in promissory notes.  It also ordered that Winget immediately assign the promissory notes to the Agent and pay to the Agent $22.5 million that JVIS-USA had paid on the notes.  *JPMorgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2021 WL 37479, at *11 (E.D. Mich. Jan. 5, 2021).  The court of appeals affirmed that the notes properly were subject to the constructive trust because of Winget's conduct.  *JPMorgan Chase Bank, N.A. v. Winget*, No. 21-1568, 2022 WL 2389287, at *7 (6th Cir. July 1, 2022).  On January 14, 2021, the Court granted Chase's unopposed motion to substitute Alter Domus LLC "as the administrative agent for the lenders in this action."  ECF No. 990, *Alter Domus v. Larry J. Winget*, No. 08-13845 (E.D. Mich.).

After the Sixth Circuit affirmed the constructive trust ruling, Alter Domus obtained the promissory notes from escrow and apparently then discovered that the terms of the notes had been amended in June of 2020 in several ways that allegedly reduced their value.  The changes consist of the following: the provision allowing the holder to demand payment before the maturity date was eliminated; the maturity date was extended for three years; the provision requiring JVIS-USA to pay annual installments of accrued interest was eliminated; and past defaults were waived, which forestalled the triggering of a higher interest rate obligation.  On July 3, 2023, Alter Domus demanded that JVIS-USA pay all unpaid principal and interest on the notes, but JVIS-USA refused

to make payment.  Alter Domus therefore brought this action asserting claims against JVIS-USA for breach of contract based on its failure to make payment, and fraudulent transfer and unjust enrichment against JVIS-USA and Winget based on the amendments.  JVIS-USA filed a counterclaim seeking a declaratory judgment that the promissory notes were unlawful distributions (and that the Agent therefore may not enforce them) on the ground that it was insolvent when they were issued.  *See* Michigan Compiled Laws § 450.4307(1).

The disputed factual and legal issues for trial are whether Alter Domus is the real party in interest and has constitutional standing to pursue its claims; whether the amendments to the notes transferred a thing of value for less than reasonably equivalent value; whether the defendants acted with actual intent to hinder, delay, or defraud the Agent's collection efforts as to the notes; whether the defendants were unjustly enriched by the amendments of the notes; the amount of damages that would be due; and whether JVIS-USA was insolvent under Michigan Compiled Laws § 450.4307(1)(b) when it issued the two promissory notes on June 29, 2017, that is, whether its total assets were less than the sum of its total liabilities as of that date.

## B. Witness Testimony

### 1. The Plaintiff

#### a. Timothy Meinhart

The plaintiff offered the two promissory notes through accountant Timothy Meinhart and asked him to perform a damages calculation on the basis of the payments made and the amounts that remained owing.  He provided alternative scenarios based on the terms of the notes as originally issued and then calculated the amounts allegedly owing under the amendments.

Mr. Meinhart explained that interest rate on the notes was three percent on any outstanding principal, accruing on a daily basis using a 365-day year.  If the note is in default, the rate becomes

10 percent.  The notes were due on demand or July 1, 2020.  He calculated the unpaid balance with

June 29, 2017 as Day 1.  He also assumed that payments made in 2017, totaling $25 million, were

made at the end of the day on June 30, 2017, so two days of interest would have accrued.  He then

applied payments to the interest and then to the principal.  After December 31, 2017, he used the

ten percent interest rate that applied if JVIS-USA was in default.  He used a 366-day calculation

in 2020 and 2024.  He calculated the final outstanding balance on the notes as $216,179,621.54 as

of the date of trial.

In a scenario where the default was waived and the maturity date is July 1, 2023, the final

combined balance is $168,033,139.72.  If an additional $20 million payment was made in 2018

and allocated on a 90/10% split over the two notes without considering the amendments, the

balance is $184,229,153.42.  And under a scenario accounting for the additional $20 million and

the amendments, the balance is $142,926,308.93.

Breaking down these calculations, under the original GRAT Note, Mr. Meinhart opined

that the total amount owed as of February 18, 2025 was $165,803,908.35, taking into account the

applicable interest, a $22.5 million payment made in June 2017, and an additional $20 million

payment made in June 2018 allocated proportionally between the notes.  Under the original Winget

Note, the total amount owed as of February 18, 2025 was $18,422,656.48, taking into account the

applicable interest, a $2.5 million payment made in June 2017, and an additional $20 million

payment made in June 2018 allocated proportionally between the notes.  Lesser amounts would be

due if the amendments were considered, as indicated above.  But Meinhart failed to consider the

prepayment provision in Section 5 of the notes and never gave an opinion of the amounts due when

the "reverse allocation" formula required by that section was taken into account.

Mr. Meinhart stated that his figures would be slightly different if only one day of interest accrued between June 29 and June 30, and also would be different if not adjusted for leap years. He did not assess whether the notes could have been monetized in 2023 or look at JVIS-USA's financial statements from the time the notes were amended.

Mr. Meinhart was recalled as a witness in support of Alter Domus's defense case against the counterclaim. His additional testimony is discussed below.

### b. Deposition Designations

#### 1. **Timothy Bradley**

The plaintiff offered excerpts of the deposition of **Timothy Bradley**. He, along with Nicholas DeMiro, is the manager of JVIS-USA LLC and oversees its operations. He and Mr. DeMiro authorized the issuance of the promissory notes and were the only JVIS-USA officials consulted about them, although he also consulted with counsel. He stated that Mr. Winget generally was aware of the state of the business. The notes were allocated in proportion to the GRAT and Winget's 90/10% relative membership interests in JVIS-USA. JVIS-USA was bound by the notes to make annual interest payments. It was understood that a failure to make interest payments constituted an event of default, but this was not a practical concern because of the nature of Winget's relationship with the business. He believed that JVIS-USA probably could have made interest payments in 2017, but it did not make the first interest payment due on December 31, 2017 because Winget did not request it. JVIS-USA had sufficient funds to pay its other creditors and employees through 2019, but it would not have had sufficient funds to pay the notes. In 2020, JVIS-USA was making payments to its other creditors, but some of these payments were late. JVIS-USA also issued promissory notes to other Winget-controlled entities during that period, which were not paid or amended like the notes at issue in this case.

Mr. Bradley also described JVIS-USA's structure.  It is divided into two divisions, designated as "Imports" and "Harper."  Harper manufactures auto parts at a plant in Clinton Township, Michigan.  Imports deals with suppliers in China and Korea and sells parts to Tier-1 suppliers and original equipment manufacturers (OEMs).  JVIS-USA also has a wholly owned subsidiary, JVIS Manufacturing, LLC, that Bradley manages along with Mr. DeMiro.  That company makes automotive plastic injection molded parts in Benton Harbor, Michigan.

Mr. Bradley testified that JVIS-USA and Winget decided to amend the two notes in 2020 out of concern about the principal that was due and payable.  The concern was not connected to the prior missed interest payments.  However, the principal needed to be addressed because it was a big number, in contrast to interest, which could accrue on the company's books.  The amendments extended the maturity date, eliminated a demand feature, waived defaults, and eliminated annual interest payments.  He was not aware of Winget ever making a demand on any of his promissory notes, and he invoked attorney-client privilege when asked about the decisions regarding specific amendments.

### 2. **Nicholas DeMiro**

The plaintiff offered excerpts of the deposition of **Nicholas DeMiro**.  He is JVIS-USA's other manager.  JVIS-USA is headquartered in Shelby Township, Michigan, where the Import division does most of its work.  DeMiro testified that he had no concerns about JVIS-USA's ability to pay any part of the notes on time when they were authorized, but he was not aware if the company ever made payments.  He also never expected that Winget would demand payment.  If Mr. Winget had demanded payment in 2020, it would have harmed the business.  He acknowledged that one of JVIS-USA's business plan documents includes an income statement that consolidated its finances from all of the company's divisions, including JVIS Manufacturing.

-8-

### 3. **Larry J. Winget**

The plaintiff offered excerpts of the deposition of defendant **Larry J. Winget**.  He gave an overview of JVIS-USA's business.  He stated that Stellantis Corporation (formerly Chrysler Corporation, formerly FCA US, LLC) was its largest customer in 2017, accounting for about 70% of its business.  He explained that JVIS-USA's managers would prepare an annual financial report to be given to Stellantis, and he agreed that the OEMs would not want to do business with an insolvent entity.  Mr. Winget said he would have been aware if JVIS-USA had ever reported that it was insolvent.  JVIS-USA continues to do business with Stellantis and has never represented to it that it was insolvent.

Mr. Winget acknowledged that the operating agreement of JVIS-USA required managers to approve all non-cash distributions and prohibited distributions if the effect would have rendered the company unable to pay its debts as they came due in the usual course of business or caused its liabilities to exceed its assets.  He also stated that he would not expect his managers (Bradley and DeMiro) to have violated that provision.  He typically wants a security interest as collateral for loans and he thought there would be a security agreement for the notes at issue in this case.  He never intended to exercise his right to demand payment.  He also had not contemplated the possibility of executing a forbearance agreement rather than amending the terms of the notes.  He said the intent of the amendments was to protect JVIS-USA's solvency and increase the likelihood the notes would be repaid.

### 2. Defendant and Counter-Plaintiff JVIS-USA

#### a. **Joanna Anderson**

JVIS-USA called an administrator of plaintiff Alter Domus as an adverse witness.  Joanna Anderson testified that her job does not entail any investigation of claims, but that she takes

direction from the lenders (although she never talked to any of them as to this case) and she oversees this case on behalf of Alter Domus.  Alter Domus itself takes direction from the lenders and relies on counsel to investigate claims.  Here, it was directed to bring this lawsuit by the lenders after an investigation by counsel.  She did not know much about the financial conditions facing the auto industry in 2020.  She said Alter Domus does not have a financial stake in the notes, but it is the administrative agent under a credit agreement that manages the litigation.  Alter Domus would not get the money if it prevails in this case, but Alter Domus is the only entity with the right to file the lawsuit.

### b. **Timothy Bradley**

Timothy Bradley testified in person at trial.  He stated that his employer technically is Venture Sales and Engineering Corporation, which houses Winget's top executives.  He sees himself as the "executive vice president and general counsel" of Winget's family of businesses, but also as Winget's personal attorney.  He is an attorney and also has business and accounting degrees.

He explained that all of the Winget companies, JVIS-USA included, have had trouble obtaining outside financing due to this litigation.  He also stated that the notes here memorialize distributions that Winget could have taken but left in JVIS-USA in 2011, 2012, 2013, 2014, and 2015 through 2016 to utilize as working capital, and that he has already paid taxes on them as income.  He testified, however, that JVIS-USA was under no legal obligation to distribute any amount to Winget to cover taxes he incurred on the income.  The total amount of the notes, $150 million, represents the difference between JVIS-USA's income during that period and the amount Winget had paid in taxes.  At the time the notes were issued, no one thought they were distributions.

Mr. Bradley stated that Mr. Winget has never demanded payment on notes issued to his companies. JVIS-USA made the 2017 payments totaling $25 million on the notes shortly after executing them as a way to fund the GRAT to cover an upcoming obligation, but JVIS-USA could not have paid off the entire balance of the notes at that time. As for the 2018 $20 million payment, it went to JVIS Investments, LLC because that entity served as a cash-management company for Winget to pay taxes on JVIS-USA's income. Mr. Bradley explained that Winget's practice in reporting his taxes would be to total the income of all of the LLCs he owns, including JVIS-USA, and then JVIS Investments would pay an amount equal to the amount due for all of the flow-through entities. JVIS Investments used at least some of that money to pay JVIS-USA's taxes, but Bradley could not state what portion of those funds were for that purpose. The 2017 and 2018 payments were the only payments on the notes.

He testified that JVIS-USA's net income had been on the decline during the years preceding the pandemic, but the pandemic dramatically exacerbated the situation. In 2020, when the notes were set to mature, the remaining principal balance was $105 million, which JVIS-USA could not pay. He and outside counsel had a conversation with Mr. Winget about amending the notes. One rationale for the changes was to become eligible for certain government COVID-era loans, which had a requirement that recipients be solvent. To participate in the government loan programs, JVIS-USA had to join with a private bank partner for some of the funds. Comerica Bank rejected JVIS-USA's request to serve in that capacity, and overtures to other banks also were unsuccessful. He stated that no one tried to hide the amendments from the Agent. He also stated that a UCC filing statement that probably related to the notes lapsed in June of 2022.

### c. **Nicholas DeMiro**

Nicholas DeMiro also testified in person at trial.  He stated that he also works for Venture Sales and Engineering, which employs many of Winget's top officials, and he is the co-manager of JVIS-USA.  He has an engineering background but also developed finance expertise in prior roles in the automotive industry.

He testified that the majority of JVIS Manufacturing LLC's business comes from JVIS-USA.  He said that JVIS-USA's business was in decline between 2017 and 2019 because it had fewer orders from customers.  The company never provided financial information to Stellantis, its primary customer.  During 2020, JVIS-USA was able to make payroll but probably could not pay its trade creditors on time.  In early 2020, as COVID began, its main customers began shuttering their facilities and its revenue dried up.  There was a cash crunch.  When revenue started to recover, it was quite slow and productivity at JVIS-USA's factories was reduced.  JVIS-USA did obtain a payroll tax grant through the CARES Act.   He did not recall any potential COVID lenders mentioning the notes as a concern.

From his perspective, amending the notes was a way to "save the company."  JVIS-USA was not in a position to make payments in 2020.  The amendments were not motivated by a desire to avoid paying the hedge funds that held an interest in the judgment against the Trust.  He stood by each of the recitals in the amendments to the notes.

He also acknowledged that JVIS-USA's 2017 business plan displayed income and projections for JVIS-USA and JVIS Manufacturing on a consolidated basis but said this was for "internal purposes" only.  He believed that JVIS-USA is doing much better now due to proper financial management.

-12-

d. **Gregory Light**

The counter-plaintiff called Gregory Light to testify in person as an expert witness. Mr. Light is a business valuation professional at Bodmer Price & Light with degrees in economics and accounting. He previously worked at Rehmann Robinson. JVIS-USA engaged him as an expert witness to test its solvency under the Michigan LLC statute as of June 29, 2017.

Mr. Light said that he approached that task by gathering data from comparable businesses and obtaining financial reports from the company. He explained that JVIS-USA included two divisions: JVIS-Imports and JVIS-Harper. He also indicated that JVIS-USA holds a membership interest in JVIS Manufacturing, a wholly owned subsidiary, so he had to ascertain a value of that interest, which is not an item that would be reflected on JVIS-USA's balance sheet. To make that estimate, he used the capitalization of cash flow method (income approach) and the guideline public company method (market approach). They led to similar results, so he took the average of the two.

For the cash-flow method, he determined JVIS Manufacturing's value to be $22.45 million. For the market approach, he looked to the relationship between the earnings of other publicly traded auto suppliers and their market price and calculated a multiplier between those two figures, which he applied to JVIS Manufacturing's earnings (although the multiplier he selected was at the 10th percentile of the comparators'). After applying several other adjustments, he concluded a market valuation of $22.69 million was appropriate. He then took the average of the two methods, which was $22.569 million. Then he applied a discount for lack of marketability of 40% (approximately $9 million) to arrive at a $13.541 million valuation of the membership interest.

Several factors contributed to his choice of this discount: 1) the fact JVIS Manufacturing was privately held, 2) that its management team might leave as part of any sale, 3) that it could not

make distributions (although he later admitted it could), 4) its captive business with JVIS-USA, and 5) the length of time the owners of its stock would have to hold it before they could obtain liquidity in a sale. Mr. Light acknowledged that choosing an appropriate discount is more a matter of judgment than science. But he stated that he could not think of any company he had previously valued "less marketable than this."

Mr. Light then combined JVIS Manufacturing's assessed $13 million valuation with the equity value of JVIS-USA's two divisions (derived from their contemporaneous trial balances), which yielded a valuation result of negative $11.9 million as of the valuation date. In other words, the company's liabilities far exceeded its assets. Mr. Light stated, however, that if anything, JVIS-USA was worse off than he calculated.

Mr. Light also testified that any intangible assets of JVIS-USA were immaterial to his analysis. That is because intangibles are not readily subject to liquidation to pay debts. Mr. Light acknowledged co-authoring a valuation in July of 2016 that concluded that the overall business enterprise value of JVIS-USA on a fair market basis was $444.5 million. However, he believes JVIS's financial situation changed immensely from July of 2016 to June of 2017 because of the additional $150 million in notes and the charging orders, as well as the fact that 2016 was the best year ever in the auto industry. He also testified that it is entirely possible for an entity with a negative equity value to be sold for a positive value. He stated that he has never seen examples of JVIS-USA treating JVIS Manufacturing separately in its own financial reporting but stated that "they never would have a reason to" since it's a disregarded entity.

### 2. Defendant Larry J. Winget

Defendant Larry J. Winget testified in person on his own behalf. Mr. Winget is 82 years old and has worked in the automobile industry for about 62 years. He explained that JVIS-USA

was a successor company to Venture Holding, built with assets acquired out of the Venture bankruptcy in the early 2000s.  Mr. Winget said he loaned money to JVIS-USA over a ten-year period because it could not obtain financing.  His loans totaled $150 million.  The purpose of formalizing those amounts as promissory notes was to memorialize them for his estate.  He believed those funds were his.  He did not think amending the notes was wrong because JVIS-USA faced difficulties due to the pandemic. He wanted to show a good balance sheet to JVIS-USA's customers, including Honda, Subaru, Stellantis, and Toyota.

### 3.  Counter-Defendant Alter Domus

Alter Domus recalled Timothy Meinhart to testify in support of its defense to the counterclaim.  Mr. Meinhart has degrees in finance and accounting and works as an appraiser for an organization called Willamette, where he prepares valuation analyses like the one Mr. Light performed here.  He was asked to review and critique Mr. Light's expert report.  He did not offer his own opinion about whether JVIS-USA was solvent on the date it issued the notes or of the value of JVIS Manufacturing or JVIS-USA.

Instead, Mr. Meinhart opined that 1) Mr. Light failed to consider JVIS's intangible assets, 2) it was inappropriate for Mr. Light to consider JVIS Manufacturing separately from the rest of the company, and 3) Mr. Light's valuation of JVIS Manufacturing is unreliable and understates its value.

Regarding the second opinion, he explained that appraisers believe it more appropriate to value a wholly owned subsidiary at its equity value if the subsidiary and the parent do similar things.  But if a subsidiary does something completely different from its parent (for instance, a construction company that owns a sports team), it would be more appropriate to value the membership interest separately.  He believed that based on the testimony that JVIS Manufacturing

-15-

and JVIS-USA both are auto suppliers, it would not make sense to separate JVIS Manufacturing's fair market value. From a valuation standpoint, the economic benefits of JVIS Manufacturing accrue to JVIS-USA. He stated that if one were to look at the balance sheet of JVIS Manufacturing, it would reflect an equity value of approximately $28.9 million.

Regarding Mr. Light's valuation of JVIS Manufacturing, Mr. Meinhart argued that he should have assessed the company using a "liquidation" premise rather than "going concern" premise. He also did not find support other than "analyst judgments" for Mr. Light's use of a company-specific risk premium in his calculation under the income approach. He said that academics have moved away from risk premiums because that concept double-counts risk factors captured elsewhere in an analysis.

Mr. Meinhart also criticized Mr. Light's use of the 10th percentile multiplier for the guideline public company approach, which he characterized as unsupported, and he took issue with Mr. Light's "size adjustment factor" that further reduced JVIS Manufacturing's value by about 50%. He also opined that Mr. Light's use of a 40% discount for lack of marketability only would make sense if JVIS-USA's interest in JVIS Manufacturing were a non-controlling interest, but because JVIS-USA holds a 100% interest, there is little justification for a discount of that size.

However, on cross-examination. Mr. Meinhart was asked whether he was "offering the opinion that any of the errors [in Mr. Light's analysis] that [he had] testified about are sufficient to change the outcome of Mr. Light's solvency opinion." And he answered: "I — to be clear, I do not offer those opinions in my report, nor have I offered those opinions today." ECF No. 273, PageID.4827-28.

C.  Factual Conclusions

Based on the evidence that was offered and received at trial, it is apparent that defendant JVIS-USA issued the two promissory notes at issue here, one to Larry Winget as obligee on June 29, 2017 for $15 million, and one to Mr. Winget's GRAT (grantor retained annuity trust) as obligee on that same date for $135 million.  It is fair to say that none of the managers at JVIS-USA treated the notes as distributions, and therefore the solvency of the company at the time would not have been a primary concern.  The notes memorialized Winget's usual practice over the years of "leaving" distributions in the company as operating capital.  And the fact that the Trust and not Winget personally was the member entitled to distributions at the time they were made and then left in the company likely would not have been significant to Winget, either.  He undoubtedly assumed that he and the Trust shared legal identities, as Court of Appeals Judge Alice Batchelder explained in her dissenting opinion in one of the many appeals in this case.  *JPMorgan Chase*, 2022 WL 2389287, at *11 (Batchelder, J., dissenting) (Judge Batchelder explained that "[a] revocable (or living) trust is just a conceptual way for a person (the settlor or grantor) to organize or manage his or her assets.  The settlor transfers title to the assets to the revocable trust but retains full ownership and control over those assets.  To the extent that the trustee has any role, the trustee acts at the will of the settlor and owes a fiduciary duty to the settlor. . . . The settlor can change the terms, change the contents, or even dissolve a revocable trust at any time, for any reason.").  Winget reasonably believed that he could move assets in and out of the trust as he pleased.  *Ibid.* (observing that Winget did not "risk ever losing control over [his] assets in a revocable trust. . . . As settlor, Winget can move his assets to and from, in and out, of his revocable trust at any time, for any reason.").  He personally paid taxes on the distributions, as was his obligation when the Trust received the income as a pass-through entity.

The court of appeals, however, has determined that the notes in fact were distributions when made, and that they should have belonged to the Trust — actually, *would have* been made to the Trust had Winget not dissolved it. *Id.* at *6-7 ("[B]ut for the revocation, the Trust would have been the LLC's member and the party to whom the LLC issued the promissory notes. So Chase would have been entitled to them under the charging orders."). And that frames the issues whether the amendments to the notes harmed the Agent as the Trust's judgment creditor and whether Winget in fact intended to do so.

### 1. Intent Underlying the Amendments of the Notes

The Agent contends in essence that it was harmed it two ways: one is that the changes that eliminated the causes of default (extension of maturity date, elimination of payments of annual installments of accrued interest, and waiver of past defaults to retain the original interest rate) made the notes less valuable to the holder; and the other is that the elimination of the demand feature made collection more difficult. Initially, the Agent alleged that the amendments were voidable under the Michigan Uniform Voidable Transfers Act, Mich. Comp. Laws § 566.31, *et seq.*, because no "equivalent value" was exchanged for the obligor-favorable terms of the amendment, and the amendments were made with the actual intent to hinder or delay collection of the notes. The Agent has abandoned the first theory and focused on Winget's and JVIS-USA's actual intent to delay collection of the notes.

The defendants maintain that they did not harbor such intent when they amended the notes. Instead, they say, they were attempting to portray the company in a better financial light to obtain pandemic financing. The Agent argues that this explanation is not credible. The Court does not fully agree.

The unrebutted trial testimony of DeMiro and Bradley confirmed in 2017 through 2019, JVIS-USA suffered a contraction in its business, with income falling from $54 million in 2017 to $15 million in 2019. The collection litigation interfered with its ability to borrow money. And as a consequence, JVIS-USA was suffering a cash crisis in 2019. That condition was severely exacerbated by the outbreak of the COVID-19 pandemic, which effectively shut down the auto industry, which, in turn, suppressed JVIS-USA's revenue when the company shut down for approximately two and a half months. DeMiro said that the resulting loss approximated $50 million. It is entirely plausible that the company needed to eliminate the default status of the notes so that it could endeavor to secure third-party loans or government assistance or both through the Paycheck Protection Program offered by the U.S. Small Business Administration or the Main Street Loan program. The defendants argue that the motive behind the amendments that waived past defaults, eliminated annual interest payments, and extended the maturity date was to save the company, not to interfere with Alter Domus's (or, at the time, Chase's) collection efforts. And that explanation is plausible in light of the economic conditions at the time.

However, those circumstances do not fully explain the move to eliminate the demand feature of the notes. Here, the evidence of the discussion that circumscribed the decision to craft the amendments is more telling. On June 3, 2020, Winget's attorney told him that "JVIS could resist Chase's efforts to collect on the notes which would only delay its collection efforts for a short time. So, we need a strategy to prevent Chase from enforcing the notes, should it prevail on its motion, until the merits of Larry's right to revoke is finally resolved." Ex. 106 at WINGET00644. Counsel explained that "[t]hese changes to the notes would also benefit Larry in the pending litigation by thwarting, for at least the next 3 years, Chase's ability to enforce the notes, should the court allow it to claw them back." *Id.* at WINGET00644-45. Winget argues that

-19-

his lawyer's statements cannot be imputed to him.  But plainly he was given this counsel as one of a few options open to him.  The Court concludes that Winget and JVIS-USA acted on this advice by eliminating the demand feature of the notes and extending the maturity date to July 2023.  By doing so, the defendants acted with the actual intent to hinder and delay Chase's efforts to enforce the Notes, which it came to possess under the constructive trust determination and the Court's orders.

Defendant Winget argues that the Agent's criticism that Winget nor JVIS-USA sought a forbearance agreement is tantamount to a concession that delaying the collection or eliminating the demand feature did not harm it.  That argument ignores the reality that broaching the topic of a forbearance agreement is simply a start of negotiations, which no doubt would have led to a demand for other concessions from Alter Domus.  The plaintiff's argument amounts to no concession; it simply points out that the defendants had other options to amending the notes.

## 2.  The Amounts Due on the Notes

Under any scenario, JVIS-USA is in default on the notes.  The original notes were due on July 1, 2020, and the amendments extended the due date only to July 1, 2023.  JVIS-USA made a payment of $22.5 million on the GRAT Note to Mr. Winget as trustee of the GRAT on June 30, 2017.  On that same date, JVIS-USA made a payment of $2.5 million on the other note, for a total of $25 million in payments at that time.  In June 2018, JVIS-USA made a payment in the amount of $20 million, which was directed to JVIS Investments, LLC, which is wholly owned by Winget, and JVIS-USA treated the payment as a reduction on the balance owing on the notes.  However, the notes to date are not fully paid, and the maturity dates have passed.

Section 5 of the notes allows for prepayments, with the amounts to be "applied to the amounts due in reverse order of their due dates."  Exs. 1, 2.  The payments in 2017 and arguably

in 2018 constituted prepayments of the principal amounts due and owing.  Neither side offered evidence of the amounts due under either note when the allocation required by the prepayment provision in section 5 of both notes was applied.  Without applying that section, under the original GRAT Note, the total amount owed as of February 18, 2025 would be $165,803,908.35, taking into account the applicable interest, a $22.5 million payment made in June 2017, and an additional $20 million payment made in June 2018 allocated proportionally between the notes.  Under the original Winget Note, the total amount owed as of February 18, 2025 would be $18,422,656.48, taking into account the applicable interest, a $2.5 million payment made in June 2017, and an additional $20 million payment made in June 2018 allocated proportionally between the notes. But these amounts are not supported by the evidence because that section has not been applied.

### 3.  Financial Condition of JVIS-USA in June 2017

JVIS-USA was comprised of two divisions known as JVIS-Harper (Harper) and JVIS-USA-Imports (Imports).  It also owned a 100% membership interest in a separate entity known as JVIS-Manufacturing, LLC.  Gregory Light testified that as of June 29, 2017, the total assets of Harper exceeded its liabilities by $29,672,818, and on that date the total liabilities of Imports exceeded its assets by $55,161,598.  Consequently, as of June 29, 2017, the total liabilities of Harper and Imports exceeded their assets by $25,488,780.  The plaintiff does not dispute this evidence, and it has not offered any evidence to contradict it.

The main contested fact at trial bearing on the solvency of JVIS-USA on the date the notes were issued was how to account for JVIS-USA's membership interest in JVIS-Manufacturing. Mr. Light valued the membership interest at $13,541,700, which led to his conclusion that on the date the notes were issued originally, JVIS-USA's liabilities exceeded its assets by $11,946,760. Alter Domus did not offer evidence of its own of JVIS-USA's assets and liabilities as of the

valuation date.  Instead, it criticized Mr. Light's method of valuing the membership interest in JVIS-Manufacturing and urged the conclusion that it is high enough to bring JVIS-USA into positive territory.  It does not offer positive proof of JVIS-USA's net worth; rather it argues Mr. Light's testimony is not credible and that the Court should disregard it.  It also offers evidence of other valuations of the company around the date that the notes were issued, and it points to circumstantial evidence that the managers of the company did not regard it as insolvent.

First, the plaintiff says that Light failed to consider a consolidated financial statement that included the book value of wholly owned JVIS Manufacturing along with the book values of the Harper and Imports divisions.  However, although some generally accepted accounting principles allow such a practice, they do not mandate it.  *See* Shannon P. Pratt, *Valuing a Business* 123 (6th ed. 2022) ("If a company owns 50% to 100% of another company's stock, it *generally* prepares consolidated statements . . . . Consolidated statements treat the parent and subsidiaries as if they were all one company . . . .") (emphasis added).   The Michigan LLC statute includes few details about how the value of a company's assets and liabilities should be computed.

Mr. Light's approach, which valued JVIS-USA's membership interest in JVIS Manufacturing, was not incorrect.  Moreover, it honored the basic premise that a membership interest in an LLC does not entitle the member to any of the discrete assets of that entity.  The value of a wholly owned subsidiary to its parent comes from the value of the membership interest, not from the equity value obtainable from its balance sheet.  *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) ("A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary.").  The

Michigan LLC statute speaks of an LLC's "total assets" and "total liabilities," *see* Mich. Comp. Laws § 450.4307(1)(b), and the membership interest is an asset.

Second, the plaintiff believes that one can determine JVIS-USA's membership interest in JVIS Manufacturing by simply looking at the balance sheet of JVIS Manufacturing. That argument essentially mimics the contention discussed above. Mr. Light adequately explained his reason for using Harper's and Import's balance sheets to assess value, while treating JVIS Manufacturing differently: the value of that entity to JVIS-USA was the membership interest, not the book value of the assets.

Third, the Agent argues that Mr. Light failed to consider the value of JVIS-USA's intangible assets (including those of the Harper and Imports divisions), i.e., trained workforce, customer relationships, customer contracts. But Mr. Light adequately explained that intangible assets would be immaterial to the conclusion that JVIS-USA was insolvent on June 29, 2017, because any intangibles are not readily liquid. And accounting for JVIS-USA's intangible assets would have required consideration of its off-balance sheet liabilities, such as severance costs, future rent payments, a guarantee or warranty for parts, or a lawsuit. Moreover, such a consideration would have required unreliable speculation. And it is noteworthy that Mr. Meinhart did not present any evidence of any intangible assets attributable to JVIS-Harper or Imports that would alter the conclusion that JVIS-USA was insolvent as of June 29, 2017.

Fourth, the Agent argues that Mr. Light should not have considered the negative effect of the charging lien because the lien was not granted until August 2018, after the June 29, 2017 valuation date. But the well-known chronology of this case easily demonstrates that all of JVIS-USA's interests labored in the shadow of the substantial judgment possessed by Chase, which was being aggressively pursued, and that Chase was pursuing a constructive trust over all the assets as

early as 2015.  In addition, Mr. Light testified that he took a conservative approach to valuation and stress-tested his model, and that if he disregarded the impact of the charging orders, he would have concluded that JVIS-USA was insolvent as of June 29, 2017.

Fifth, Alter Domus levels several methodological criticisms at Mr. Light's calculation of the value of JVIS Manufacturing as a discrete entity, and therefore the value of the membership interest.  Mr. Light readily accepted one of Mr. Meinhart's critiques related to the "beta" used as part of the income approach in valuing JVIS Manufacturing, but this change only increased his computed value of JVIS Manufacturing by approximately $200,000 — not nearly enough to alter his conclusion that JVIS-USA's liabilities exceeded its assets.  The Agent says that Mr. Light should not have applied a company-specific risk premium to the value of JVIS Manufacturing because that resulted in double counting factors that were captured elsewhere in the weighted average cost of capital.  Alter Domus says that when using the market approach to value JVIS Manufacturing applying the guideline public companies method, Mr. Light unreasonably used the 10th percentile of the 56 companies he selected, and he failed to assess the correlation between profitability and size and the actual multiple.  Relatedly, it criticizes Mr. Light's use of a further multiple of 47.6%, which was 2.3 times EBITDA, the lowest of the 56 companies he selected. And it maintains that after averaging the results of the income and market approaches, Light unreasonably applied a 40% discount to JVIS Manufacturing due to lack of marketability, which differed from the 25% discount factor he used when calculating an earlier valuation of the 90 non-voting shares of JVIS-USA.

The Court does not believe that any of these factors renders Mr. Light's valuation of the membership interest of JVIS Manufacturing unreliable.  Alter Domus has not offered any alternative valuations, except for suggesting competing calculations when different techniques are

used.  But more tellingly, Alter Domus's own expert did not testified that any of the supposed errors in Mr. Light's analysis would have been sufficient to change the outcome of Mr. Light's solvency opinion, and he offered no opinion of his own on the company's solvency.

The plaintiff also points to other evidence that the valuation of JVIS-USA was higher in June 2017 than Mr. Light estimated.  It contends that Winget took a contrary position in the 2008 case as to JVIS-USA's solvency and makes reference to an objection Winget filed in the 2008 case to a special master's report and recommendation in which he asserted that "there is no evidence or claim that the distributions at issue were made when any of the LLCs were insolvent." *Alter Domus v. Larry J. Winget*, No. 08-13845 (E.D. Mich.), ECF No. 949-4, PageID.31259.  That argument is disturbingly misleading, however.  The reference in the objection was not directly to the promissory notes; instead, Winget was referring to the underlying distributions in the years before 2015.  His position — a position consistently maintained until the court of appeals disabused him of it in its 2022 split decision — was that the promissory notes were not distributions at all. Instead, they represented loans he made by leaving the distributions in the company.

The plaintiff also points to a valuation performed by Rehmann Consulting that determined that the fair market value of the GRAT's interest in JVIS-USA on July 1, 2016 was $346,165,000. That report was signed by Gregory Light.  The parties agree that the Rehmann report was not a solvency analysis, but instead it was created to establish the value of the 90 Class B Non-Voting units of the company, to be used for Winget's estate planning.  Mr. Light explained that the report was not limited to evaluating JVIS-USA's financial health and was completed before the promissory notes were issued.  He said that his valuation of the company considered future earnings and the global economic outlook when he attempted to put a value on the units.  He did not take into account JVIS-USA's $150,000,000 debt reflected by the notes.  Mr. Light's

explanation plausibly accounts for any perceived inconsistency between the Rehmann report and his trial testimony on the solvency of JVIS-USA as of the dates the notes were issued. And, as discussed earlier, the value of a company is not the same as its solvency.

Alter Domus also points out that JVIS-USA never failed to pay its trade creditors or missed a payroll, never expressed a belief to its larger customers that it was insolvent, and it never considered voiding the notes from their beginning because of its insolvency. Those arguments, however, ignore the hard fact that neither Winget nor JVIS-USA, nor its managers ever conceived of the notes as distributions by an LLC to its member. Instead, they always were treated as memorializing prior loans that funded operating capital. None of that evidence undercuts Mr. Light's analysis and evaluation of JVIS-USA's financial condition as of the date the notes were issued.

The Court concludes, therefore, that as of June 29, 2017, when the promissory notes were issued, the liabilities of JVIS-USA exceeded its assets.

## II. Conclusions of Law

Based on these findings, the Court concludes as follows:

### A. Standing

Prompted by the testimony of Alter Domus's representative Joanna Anderson that her company does not have a financial stake in any recovery on the promissory notes, the defendants argue that Alter Domus is not the real party in interest under Federal Rule of Civil Procedure 17 and does not have Article III standing to bring its claims. They contend that Ms. Anderson's testimony has muddied the water about Alter Domus's relationship with JPMorgan Chase, the prior agent, and they argue that any claims should have been brought on behalf of the lenders, who actually have a financial stake in the outcome. They also contend that even if Alter Domus has

standing to assert claims based on the Court's assignment to it of the promissory notes, it only may assert its contractual claim, as it lacks standing to assert claims that sound in tort.

The Court has addressed a nearly identical issue in the underlying case where defendant Winget sought relief from the underlying judgment that spawned the present litigation. The Court determined that Alter Domus had standing to enforce that judgment in its own right because of an Agency Transfer Agreement, by which Alter Domus was "vested with all the rights, powers, privileges and duties of the Administrative Agent under the Primary Credit Agreement and the Loan Documents . . . ." *JPMorgan Chase*, 08-13845, ECF No. 1212-2, PageID.35379; *see id.*, ECF No. 1241.

It was appropriate for the defendants to raise the issue of standing as it impacts subject matter jurisdiction, even after the trial. A federal court must consider its own jurisdiction through all stages of the litigation. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) ("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance."); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

It is well settled that federal courts have the authority under Article III of the Constitution to adjudicate only actual "Cases" and "Controversies." U.S. Const. Art. III, § 2. A component of that prescription is that a plaintiff must have standing to press his claims. It has come to be recognized that "standing" requires a plaintiff demonstrate that he has suffered an actual or imminent, concrete and particularized injury; that the injury is fairly traceable to the conduct of the defendants; and that a favorable judicial decision likely would offer relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "The facts necessary to establish standing, however,

must not only be alleged at the pleading stage, but also proved at trial." *Gill v. Whitford*, 585 U.S. 48, 69 (2018).

The defendants take Ms. Anderson's testimony to mean that Alter Domus ultimately will not benefit from any judgment in its favor and argue, therefore, that Alter Domus has no "personal stake" necessary to invoke the Court's jurisdiction under Article III. The defendants are incorrect.

In *Sprint Communications Co. v. L.P. v. APCC Services, Inc.*, 554 U.S. 269 (2008), the Supreme Court held that "[l]awsuits by assignees, including assignees for collection only" qualify for federal jurisdiction under Article III. *Id.* at 285. The Court rejected the view that the assignees had not suffered an injury-in-fact, reasoning that the assignment transferred the claims in dispute "lock, stock, and barrel." *Id.* at 286. The Court also rejected the contention that the assignment agreement to remit all of the proceeds to the assignors harmed the plaintiff's ability to demonstrate redressability. Because "a legal victory would unquestionably redress the *injuries* for which the [assignees] bring suit," the plaintiff's ultimate disposition of the proceeds — "whether [it] remit[s] the litigation proceeds . . ., donate[s] them to charity, or use[s] them to build new corporate headquarters" — was irrelevant. *Id.* at 287.

Alter Domus's claims in this case are based on its *own* injuries, brought about by JVIS-USA's failure to make payment on promissory notes Alter Domus owns by virtue of the Court's constructive trust order and the defendants' allegedly unlawful amendments to the terms of the notes that reduced their value. The evidence on this point is undisputed. The parties' stipulations of fact before trial include the statement that "[p]ursuant to a January 5, 2021, order of the Eastern District Court of Michigan, the remedy of a constructive trust as to the Notes for the benefit of Alter Domus (US) LLC was granted." Joint Final Pretrial Order, ECF No. 248, PageID.3707. The Court may take judicial notice of the order in the 2008 case assigning the notes. Fed. R. Evid. 201.

-28-

As a technical matter, the Court's order required Winget to assign the notes to JPMorgan Chase, not to Alter Domus. *See JPMorgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2021 WL 37479, at *11 (E.D. Mich. Jan. 5, 2021), *aff'd in part, rev'd in part*, No. 21-1568, 2022 WL 2389287 (6th Cir. July 1, 2022). However, the later judgment entered under Rule 54(b) assigned the notes to Alter Domus. *See* Judgment, ECF No. 1017, *Alter Domus v. Larry J. Winget*, No. 08-13845 (E.D. Mich.). And the Court takes notice of its order granting the plaintiff's unopposed motion to substitute Alter Domus "as the administrative agent for the lenders in this action." ECF No. 990, *Alter Domus v. Larry J. Winget*, No. 08-13845 (E.D. Mich.). The purpose of the Court's assignment was to transfer to Alter Domus property to which the Court had found it rightfully was entitled. *See JPMorgan Chase Bank, N.A. v. Winget*, No. 21-1568, 2022 WL 2389287, at *7 (6th Cir. July 1, 2022) (recognizing that "but for [Winget's] revocation, the Trust would have been the LLC's member and the party to whom the LLC issued the promissory notes. So [the Agent] would have been entitled to them under the charging orders."). At this stage in the litigation, the defendants cannot seriously quarrel with the proposition that Alter Domus has a property interest in the notes themselves. Therefore, it has standing under Article III to sue to enforce payment of the notes because it has demonstrated an injury traceable to JVIS-USA that can be remedied by a judgment.

The defendants also posit that if Alter Domus has standing in this case based on its status as assignee of the notes, then its fraudulent transfer and unjust enrichment claims, which do not sound in contract law, must be dismissed. Those claims, they argue, were based on a theory that Alter Domus was a judgment creditor of the Trust; if it has disavowed that status by admitting that it is not a lender with an interest in the underlying debts, it cannot maintain those claims. This argument also fails to persuade.

In the typical course, an assignment treated as a contract by which a property right is transferred from one to another. *See* 6 Am. Jur. 2d Assignments § 1; *Macomb Interceptor Drain Drainage Dist. v. Kilpatrick*, 896 F. Supp. 2d 650, 658 (E.D. Mich. 2012). Courts therefore treat the scope of a parties' rights and remedies under an assignment in accordance with ordinary rules of contract interpretation. *Macomb Interceptor*, 896 F. Supp. 2d at 658. For the defendants, this is significant because of the existence of case law interpreting certain frequently employed language in assignment agreements to limit the ability of assignees to raise, in addition to contract claims, "tort or statutory claims that are merely related somehow to the contractual relationship but that arose outside of the rights created by the contract." *Id.* at 660.

However, this point conflates Article III standing and arguments about the proper party to raise a particular claim, which are more appropriately considered in an analysis under Civil Rule 17; *see Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730-32 (6th Cir. 2016) (distinguishing between Article III standing and Rule 17's real-party-in-interest requirement, which focuses whether the party is the person "who is entitled to enforce the right asserted under the governing substantive law."). In *Cranpark*, the court of appeals made plain that "[a] plaintiff may have standing in the Article III sense but not be the real party in interest." *Id.* at 732; *see also Stewart v. Martin*, 143 F.4th 675, 683 (6th Cir. 2025) ("[W]hether a plaintiff has a right to legal relief on the merits doesn't affect whether a plaintiff has constitutional standing."). This Court likewise has recognized that Michigan courts frequently use the term "standing" "to address a person's legal right to relief under a particular contract as a party or beneficiary," but this is a merits issue. *Passmore v. Fid. Brokerage Servs., LLC*, 767 F. Supp. 3d 537, 544-45 (E.D. Mich. 2025). The defendants' concerns regarding Alter Domus's standing to assert tort claims more appropriately are addressed under Rule 17 and do not implicate Article III.

Plaintiff Alter Domus claims it was injured by the defendants' modifications to the terms of promissory notes it was assigned by the Court and that JVIS-USA failed to timely make payment on the notes. This injury directly is traceable to the conduct of the defendants and could be remedied by money damages or other equitable relief. Accordingly, Alter Domus has standing to bring its claims in this case, and any agreement regarding the disposition of those proceeds is irrelevant.

## B. Rule 17

The defendants also contend that Alter Domus is not the appropriate real party in interest, but these arguments likewise must be rejected.

Under Civil Rule 17, "an action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). "Under the rule, the real party in interest is the person who is entitled to enforce the right asserted under the governing substantive law." *Certain Interested Underwriters at Lloyd's, London, England v. Layne*, 26 F.3d 39, 42-43 (6th Cir. 1994).

Alter Domus suggests that the defendants waived any argument that Rule 17 might implicate. The Sixth Circuit has recognized that "the real-party-in-interest requirement is generally viewed as 'an affirmative defense that can be waived,'" *Cranpark, Inc.*, 821 F.3d at 730 (quoting *RK Co. v. See,* 622 F.3d 846, 850 (7th Cir. 2010)). "When raised late in litigation . . . challenges under Rule 17(a) are generally considered waived or forfeited." *Ibid.* The defendants respond that they only ascertained the basis for a challenge during Ms. Anderson's trial testimony so had no opportunity to raise it earlier. Alter Domus pushes back, however, asserting that Ms. Anderson's testimony at trial was consistent with her deposition. It failed to attach a transcript of the deposition to its filings, so that contention is impossible to evaluate. No matter. Waiver arguments are not a good fit for the present circumstances since the Court raised the issue on its

own. *See Williams v. City of Detroit*, No. 16-14112, 2019 WL 2410719, at *6 (E.D. Mich. June 7, 2019) (observing that courts may raise Rule 17 issues on its own motion).

The Sixth Circuit teaches that where the original plaintiff has "no standing to bring this action," it has "no standing to make a motion to substitute the real party in interest." *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002). Seizing on this caselaw, the defendants contend that the Agent is not the real party in interest because it lacks standing. But that is not true for the reasons explained above. Also as above, the defendants argue that Alter Domus lacks standing to raise fraudulent transfer and unjust enrichment claims. They reason that the Court's assignment to Alter Domus of the notes only conferred contractual rights and not an assignment of non-contractual claims. Two points dispense with that argument.

First, although some contracts can be read to limit the scope of an assignment of claims, *see Macomb Interceptor*, 896 F. Supp. 2d at 660, the assignment here is atypical — it was by order of the Court, not by contract. *See* Judgment, ECF No. 1017, *Alter Domus v. Larry J. Winget*, No. 08-13845 (E.D. Mich.) (directing Winget to "assign the promissory notes" to Alter Domus). The essence of the Court's order was to return to Alter Domus property to which it rightfully was entitled. Because that property took the form of promissory notes, the Court chose, in equity, to accomplish that task by ordering an assignment. The Court imposed no terms limiting the scope of the assignment under the notes. In light of the assignment's remedial nature, to correct for Winget's unjust retention of the promissory notes, the defendants cannot credibly maintain that the order in any way restricted the rights available to the Agent.

Second, the Agent's tort claims are conceptually distinct from its contract claims and seek to rectify different harms. It is well established that an assignee "stands in the shoes of an assignor, acquiring the same rights and being subject to the same defenses as the assignor." *Coventry*

-32-

*Parkhomes Condo. Ass'n v. Fed. Nat. Mortg. Ass'n*, 298 Mich. App. 252, 256-57, 827 N.W.2d

379, 382 (2012).  The fact that the notes were assigned to Alter Domus is less relevant for present

purposes than the fact that they represented a property right.   As this Court has explained:

> A promissory note is a negotiable instrument, Mich. Comp. Laws § 440.3104(1),
> (5) (stating that "'negotiable instrument' means an unconditional promise or order
> to pay a fixed amount of money, with or without interest or other charges described
> in the promise or order, if . . . [i]t is payable . . . to order at the time it is issued ...
> [and][i]t is payable . . . at a definite time"; "[a]n instrument is a 'note' if it is a
> promise"), that may be transferred to another, Mich. Comp. Laws § 440.3203(1).
> "Transfer of an instrument . . . vests in the transferee any right of the transferor to
> enforce the instrument. . . ." Mich. Comp. Laws § 440.3203(2).

*In re Pazdzierz*, 459 B.R. 254, 260 (E.D. Mich. 2011), *aff'd and remanded*, 718 F.3d 582 (6th Cir.

2013).

The theory underlying the fraudulent transfer and MUVTA claims is that Winget and JVIS-

USA should not have amended the promissory notes.  That theory is entirely distinct from a breach

of contract claim under the notes themselves based on JVIS's failure to abide by their terms.  *See*

*ibid.* (stating that Michigan recognizes a distinction between pure fraud claims, which are not

assignable and claims that are assignable, such as where relief "depends upon showing fraud

incidentally" (quoting *Howd v. Breckenridge*, 97 Mich. 65, 69, 56 N.W. 221, 222-23 (1893)); *see*

*also Morris v. Schnoor*, No. 315006, 2014 WL 2355705, at *29 (Mich. Ct. App. May 29, 2014)

(concluding that an assignee's unlawful transfer claim was personal to it and not derivative of its

rights via the original assignor in light of evidence that the defendants were aware of the

assignment and sought to avoid paying the assignee).

Finally, the defendants assert that the Agent is a "shell plaintiff" whose claims are based

on the interests of certain unnamed lenders.  ECF No. 278, PageID.4942.  But that is an incorrect

reading of the record.  The judgment entered in favor of Chase, Alter Domus's predecessor in the

2008 litigation, was in Chase's capacity as an agent of the lenders, not merely as one of the lenders

that may hope to benefit from a successful recovery.  Recall that the guaranty that was the source of Chase's claims in the 2008 litigation was executed in favor of "the Administrative Agent [i.e., Chase] for the benefit of the Lenders."  *See* ECF No. 1-3, PageID.20, *Alter Domus v. Larry J. Winget*, No. 08-13845 (E.D. Mich.).  From the beginning, the Administrative Agent has been the counterparty to the contract from which this litigation sprang, not the lenders.  The guaranty always has been the Administrative Agent's to enforce.  Any side agreements regarding the distribution of proceeds of any recovery to the lenders are irrelevant.  Regardless, Rule 17 makes clear that "a party . . . in whose name a contract has been made for another's benefit" may sue in its own name "without joining the person for whose benefit the action is brought."  Fed. R. Civ. P. 17(a)(1)(F). The evidentiary record in this case makes abundantly clear that Alter Domus fits the bill as the administrative agent pursuing this litigation for the ultimate benefit of the lenders.  Alter Domus is the appropriate real party in interest.

## C.  Breach of Contract Claim

Alter Domus argues that the failure to pay the notes after the maturity date amounts to a breach of contract.  The Court agrees.  To prove a breach of contract claim, a plaintiff must show that "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach."  *Bank of Am., NA v. First Am. Title Ins. Co.*, 499 Mich. 74, 100, 878 N.W.2d 816, 829 (2016).  All three elements are satisfied by a preponderance of the evidence.

Michigan law defines a promissory note as "a written unconditional promise by one person to pay to another person therein named . . . a fixed sum of money. . . ."  *Parker v. Baldwin*, 216 Mich. 472, 474; 185 N.W. 746, 747 (1921).  A promissory note is a contract.  *Collateral Liquidation v. Renshaw*, 301 Mich. 437, 443; 3 N.W.2d 834, 836 (1942).  The notes called for

payment by July 1, 2020; even the amended notes matured by July 1, 2023. The evidence establishes beyond doubt that the full amounts due on the notes were not paid by the maturity dates. Alter Domus is the assignee of the notes and demanded payment, which was refused. The failure to pay caused the plaintiff damage.

### D.  Fraudulent Transfer Claim

Michigan's version of the Uniform Voidable Transfer Act (MUVTA) allows a court to void a transfer of property or other things of value when the debtor makes the transfer with the intent to interfere with a creditor's rights in the property. Mich. Comp. Laws 566.34(1)(a). A court also may avoid a transfer when the debtor does not receive "a reasonably equivalent value," and transfer may render the debtor insolvent. *Id.* 566.34(1)(b)(ii). Alter Domus has pleaded both theories with respect to the amendments to the notes, but, as mentioned earlier, it has not pursued the second theory.

Courts generally agree that "the Michigan statute appl[ies] only to transfers made *by the debtor*." *In re Silver*, 647 B.R. 897, 908 (Bankr. E.D. Mich. 2022); *see also Helena Agri-Enterprises, LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 268 (6th Cir. 2021) (confirming that "[t]he statute instead presumes that 'the transferor must actually be liable for the claim'" (quoting *Mather Invs., LLC v. Larson*, 271 Mich. App. 254, 720 N.W.2d 575, 578 (2006))). The statute defines a debtor as a "person liable on a claim." Mich. Comp. Laws § 566.31(f).

Both Winget and JVIS-USA qualify as "debtors" within the meaning of the statute. Winget is a debtor because he "tampered with the Trust's assets — shutting down the Trust; transferring the assets, including the promissory notes, to himself; reinstating the trusts and restoring less than the full value of the notes to the Trust — . . . Winget himself is indebted to" the plaintiff. ECF No. 85, PageID.812. JVIS-USA is a debtor, it is an obligee on the notes, and the notes were assigned

to the Agent per court order, which gives it a right of payment.  Mich. Comp. Laws § 566.31(c), (f).  Under Michigan law, a counterparty is liable to the recipient of a valid assignment.  *See Robinson v. Szczotka*, No. 359646, 2023 WL 2816798, at *3 (Mich. Ct. App. Apr. 6, 2023) ("Once a valid assignment occurs, the assignee then stands in the shoes of the assignor and may enforce the rights assigned.").

The amendments to the notes also amounts to a "transfer."  The MUVTA defines a transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset."  Mich. Comp. Laws § 566.31(s). It includes the "payment of money, release, lease, license, and creation of a lien or other encumbrance."  *Ibid.*  Winget and his GRAT owned the notes when they were issued, which was while the Trust was revoked and not returned when the Trust was reinstated.  And JVIS-USA participated in those amendments; they were an asset with respect to JVIS-USA because they transferred value.  The amendments to the notes constituted a disposal of an asset under section 566.31(s).

Finally, the plaintiff has established a voidable transfer by showing that the transferor — the defendants — had an "actual intent to hinder [or] delay . . . any creditor of the debtor."  Mich. Comp. Laws § 566.34(1)(a).  The Michigan statute lists several factors that may bear on that determination, including that "[t]he transfer or obligation was to an insider," "[t]he debtor retained possession or control of the property transferred after the transfer," [t]he transfer or obligation was . . . concealed," "[b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit," and "[t]he debtor removed or concealed assets."  Mich. Comp. Laws § 566.34(2)(a)-(d), (g).  The evidence showed that Winget and JVIS-USA entered into the amended promissory notes after receiving advice that "[t]hese changes to the notes would also

benefit Larry in the pending litigation by thwarting, for at least the next 3 years, Chase's ability to enforce the notes, should the court allow it to claw them back."  Ex. 106 at WINGET00644-45.

Once a fraudulent transfer has been proved, Michigan law authorizes a court to award and a creditor to "obtain 1 or more" forms of relief, including "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim" and "[a]ny other relief the court determines appropriate."  Mich. Comp. Laws Ann. § 566.37(a), (c)(iii).  Alter Domus alleges that the amendments harmed it by reducing the amounts owed on the notes through extending the maturity date by three years, eliminating the demand-before-maturity feature, waiving JVIS-USA's prior defaults and the resulting interest rate increase, and eliminating the requirement that JVIS pay annual installments of accrued interest.  The most appropriate relief on this count of the amended complaint is to void the amendments and reinstate the terms of the original notes.  The plaintiff offered evidence of the amount of damages when calculated based on the original notes' terms through February 18, 2025.  When brought current, and with the application of section 5 of both notes, that is the proper measure of damages for the breach of contract claim.

### E.  Unjust Enrichment Claim

Unjust enrichment is an equitable cause of action intended to "correct against one party's retention of a benefit at another's expense."  *Wright v. Genesee Cnty.*, 504 Mich. 410, 419, 934 N.W.2d 805, 809 (2019).  It "can arise when a party 'has and retains money or benefits which in justice and equity belong to another.'"  *Id.* at 410, 934 N.W.2d at 809 (quoting *McCreary v. Shields*, 333 Mich. 290, 294, 52 N.W.2d 853 (1952)).

However, Michigan law prevents parties from recovering twice for the same injury.  *See Chicilo v. Marshall*, 185 Mich. App. 68, 70, 460 N.W.2d 231, 232 (1990).  Michigan courts have explained that an unjust enrichment claim "sounds in neither tort nor contract and seeks restitution

rather than compensatory damages." *Wright*, 504 Mich. at 423-24, 934 N.W.2d at 812. The Court's remedy on the fraudulent conveyance claim fully redresses the plaintiff's injuries, and the unjust enrichment claim serves no independent purpose. In circumstances where a plaintiff prevails on another cause of action and the relief on an unjust enrichment theory would be duplicative, as here, courts usually will dismiss the unjust enrichment claim as moot. *See RPM Freight Sys., LLC v. SVB Express, Inc.*, No. 24-11215, 2025 WL 2099965, at *3 (E.D. Mich. July 25, 2025); *Chao v. Keding*, No. 18-12265, 2022 WL 5117382, at *4 (E.D. Mich. Oct. 4, 2022); *Aleris Aluminum Canada L.P. v. Valeo, Inc.*, 718 F. Supp. 2d 825, 831 n.6 (E.D. Mich. 2010); *Lube USA Inc. v. Michigan Mfrs. Serv. Inc.*, No. 07-14284, 2009 WL 2777332, at *13 (E.D. Mich. Aug. 27, 2009). The unjust enrichment count will be dismissed.

### F. Counterclaim

In its counterclaim, JVIS-USA seeks a declaratory judgment that the promissory notes were unlawful distributions under  the section of Michigan's limited liability law that makes it unlawful for a company to make distributions to members that would render it insolvent. *See* Mich. Comp. Laws § 450.4307(1). That statute states that "a distribution shall not be made if, after giving the distribution effect, . . . [t]he limited liability company's total assets would be less than the sum of its total liabilities plus" amounts needed to satisfy the preferential rights of other members on dissolution over the member who received the distribution. Mich. Comp. Laws § 450.4307(1)(b). The parties agree that the relevant test for solvency is the one found here, and they never have suggested another member of JVIS had a superior claim to the distributions here, so the inquiry focuses on whether JVIS's total assets exceed its total liabilities.

The issuance of the promissory notes was a "distribution" made by an LLC within the meaning of section 450.4307. A "distribution" is defined as a "transfer of money or other property

*or the incurrence of indebtedness* by a limited liability company *to or for the benefit of its members* or assignees of its members in respect of the members' membership interests."  Mich. Comp. Laws § 450.4102(g) (emphasis added).  Alter Domus has maintained that the promissory notes should have been issued to the Trust, because the Trust should have been the member of the LLC.  Section 450.4307 states that distributions that render an LLC insolvent (i.e., that would render "[t]he limited liability company . . . [un]able to pay its debts as they become due in the usual course of business") "shall not be made."  Mich. Comp. Laws § 450.4307(1)(a).  Section 450.4307 is not directed to either members or nonmembers, but rather to the distributions themselves.

The Court has determined as a fact that when the promissory notes were issued, JVIS-USA's liabilities exceeded its assets.  Consequently, issuance of the notes, now considered to be distributions, violated section 307(1)(b) of Michigan's LLC Act.  Mich. Comp. Laws § 450.4307(1)(a).  JVIS-USA contends that it has a right to claw back the unlawful distribution by declaring the notes void, and it cites subsection 7 of that statute as authority.  However, the provision does not create a right in the LLC to such a recovery.  It merely states:

> If a claim is made to recover a distribution made contrary to subsection (1) or if a violation of subsection (1) is raised as a defense to a claim based upon a distribution, this section does not prevent the person receiving the distribution from asserting a right of rescission or other legal or equitable rights.

Mich. Comp. Laws § 450.4307(7).  This language plainly contemplates that such an action might be brought, or, as here, "raised as a defense to a claim based upon a distribution," but the subsection does not explicitly create such a claim.  Section 308 creates liability for a member that accepts an unlawful distribution, Mich. Comp. Laws § 450.4308(3) ("A member that . . . receives a distribution with knowledge of facts indicating it is in violation of an operating agreement or section 307 is liable to the limited liability company for the amount the member . . . receives that exceeds the member's share of the amount that could have been distributed without violating

section 307 . . . ."), but JVIS-USA has not suggested that its counterclaim is governed by this statute, and neither party has addressed in any detail the appropriate or authorized remedy to apply when a distribution in the form of a debt instrument is determined to violate section 450.4307(1)(a).

JVIS-USA argues that enforcing the notes is tantamount to compelling a further distribution, which Michigan law forbids. Mich. Comp. Laws § 450.4507(6). It points out that the charging order allows the Agent "to receive only any distribution or distributions to which the judgment creditor is entitled with respect to the member's membership interest," Mich. Comp. Laws § 450.4507(2), which is its "exclusive remedy" as a creditor of the holder of an LLC membership interest, Mich. Comp. Laws § 450.4507(6). But according to the defendants, the notes themselves represent past distributions already made. *See* Mich. Comp. Laws § 450.4307(3)(b) (stating that the effect of the distribution of indebtedness, if the debt is distributed within 120 days of authorization, is measured as of the authorization date). Enforcing them would not constitute additional distributions. *See In re Michigan Mach. Tool Control Corp.*, 381 B.R. 657, 674 (Bankr. E.D. Mich. 2008) (concluding, when interpreting a similar provision of the Michigan Business Corporation Act, that a stock redemption agreement was a distribution but subsequent payments on that agreement were not separate distributions). Section 450.4507 does not bar the Agent's efforts to enforce the notes.

It is well established, however, that the law prohibits the enforcement of a contract that has been declared void or is illegal. *Krause v. Boraks*, 341 Mich. 149, 155, 67 N.W.2d 202, 205 (1954) ("All contracts which are founded on an act prohibited by a statute under a penalty are void although not expressly declared to be so and neither law nor equity will enforce a contract made in violation of such a statute or one that is in violation of public policy.") (quotation marks

omitted); *see also Allard v. Allard*, 318 Mich. App. 583, 598, 899 N.W.2d 420, 429 (2017)

("[C]ontracts founded on acts prohibited by a statute, or contracts in violation of public policy, are

void." (quoting *Maids Int'l, Inc. v. Saunders, Inc.*, 224 Mich. App. 508, 511, 569 N.W.2d 857, 858

(1997) (citing cases)); *Epps v. 4 Quarters Restoration LLC*, 498 Mich. 518, 542-43, 872 N.W.2d

412, 425 (2015) ("It is also well settled that, if a contract be void as against public policy, the court

will neither enforce it while executory, nor relieve a party from loss by having performed it in

part." (citation omitted)); *Lansing Ass'n of Sch. Adm'rs v. Lansing Sch. Dist. Bd. of Educ.*, 216

Mich. App. 79, 93 n.10, 549 N.W.2d 15, 23 (1996) ("It is well established that the courts of this

state will not enforce, either in law or in equity, a contract which violates a statute or which is

contrary to public policy."). As mentioned earlier, the promissory notes are contracts. But because

they were issued in violation of section 307(1)(b) of Michigan's LLC Act, they are illegal. JVIS-

USA therefore is entitled to a declaration that the notes are void, unless Alter Domus's defenses

to the counterclaim prevail.

### G. Waiver, Laches, and Unclean Hands

The plaintiff contends that the Court should hold that JVIS waived its right to bring the

counterclaim or that the claim is barred by the doctrines of laches or unclean hands. There is no

merit to the waiver defense. The Agent bases that argument on JVIS-USA's voluntary payments

on the notes and later amendments of them, which, says the Agent, waived its right to contest their

validity. However, a waiver consists of the intentional relinquishment or abandonment of a known

right. *Patel v. Patel*, 324 Mich. App. 631, 634, 922 N.W.2d 647, 651 (2018) (citing *Sweebe v.

Sweebe*, 474 Mich. 151, 156-57, 712 N.W.2d 708 (2006)). Magic words are not necessary, but the

waiver "must be explicit, voluntary, and made in good faith." *Ibid.* It "may be shown by 'express

declarations or by declarations that manifest the parties' intent and purpose,'" *ibid.* (quoting

*Sweebe*, 474 Mich. at 157, 712 N.W.2d at 712), or by implication where "evidenced by a party's decisive, unequivocal conduct reasonably [implies] the intent to waive," *ibid.* (quoting *Reed Est. v. Reed*, 293 Mich. App. 168, 177, 810 N.W.2d 284, 290 (2011)). The payments on the notes were made when, as this Court has determined, the defendants all believed that the notes memorialized loans made from *past* distributions. There was no reason for them to consider the notes as new distributions, and therefore, payments made on them cannot imply or infer an acknowledgement of their validity that affected the right to contest that fact when the landscape shifted. As for the amendments to the notes, that conduct actually can be considered consistent with a conclusion that the company was insolvent, and the amendments were an effort to blunt that effect.

The defenses of laches and unclean hands are raised appropriately because a declaratory judgment request seeks an equitable remedy to which these equitable defenses apply. *McCann v. U.S. Bank, N.A.*, 873 F. Supp. 2d 823, 848 (E.D. Mich. 2012) ("[D]eclaratory relief is a remedy . . . not a claim." (quoting *Mettler Walloon, L.L.C. v. Melrose Twp.*, 281 Mich. App. 184, 221, 761 N.W.2d 293, 317 (2008)); *Save Our Downtown v. City of Traverse City*, 343 Mich. App. 523, 543, 997 N.W.2d 498, 509 (2022) ("Declaratory and injunctive relief are equitable remedies.").

Turning to laches, the Michigan Supreme Court has described that doctrine as an equitable defense as "designed to lay to rest claims which are stale as well as prejudicial" to the opposing party. *Lothian v. City of Detroit*, 414 Mich. 160, 175, 324 N.W.2d 9, 17 (1982). The Court observed that the name of the doctrine "is etymologically related to the word 'lax.'" *Id.* 168 n.10, 324 N.W.2d at 13 n.1. *See also Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 584 (6th Cir. 2015) (quoting *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002)). "It is an equitable defense that bars relief when a plaintiff sits on his or her rights and, in doing so, disadvantages the other party's present defense against the claim." *Cernelle*

*v. Graminex, L.L.C.*, No. 21-1579, 2022 WL 2759867, at *9 (6th Cir. July 14, 2022) (citing *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 231 (6th Cir. 2007)). It generally bars a claim entirely, "in much the same way as a statute of limitation." *Michigan Educ. Emps. Mut. Ins. Co. v. Morris*, 460 Mich. 180, 200, 596 N.W.2d 142, 152 (1999). But the doctrine is not triggered by the passage of time alone; instead, the focus is on any "prejudice occasioned by the delay." *Lothian*, 414 Mich. at 168, 324 N.W.2d at 14; *see also McKeon Prods., Inc. v. Howard S. Leight & Assocs., Inc.*, 15 F.4th 736, 742 (6th Cir. 2021) (citing *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003)).

The Agent argues that JVIS-USA knew in March of 2020 of the Special Master's conclusion that the notes were distributions, but it did not act to declare them void at that point and instead undertook to amend the notes. JVIS-USA does not respond directly to this argument. Michigan courts have been clear that the focus of a laches argument is *prejudice* caused by the delay in bringing a claim. The Agent does not explain how its ability to litigate the validity of the notes was harmed by any delay on the part of JVIS-USA. It simply repeats its argument that JVIS-USA attempted to "thwart" its collection efforts by amending the notes. Certainly, the amendments harmed the Agent, as the Court found earlier in this opinion, but the Agent has offered no evidence that the delay in litigating the validity of the notes prejudiced it. The Sixth Circuit did not issue its decision affirming the assignment of the notes to the Agent and confirming a finding that they were distributions until mid-2022. JVIS-USA filed its counterclaim to invalidate the notes in May of 2023. Laches does not bar the counterclaim.

That leaves the defense of unclean hands. It is well settled that "[a] party seeking the aid of equity must come in with clean hands." *McFerren v B&B Inv. Grp.*, 253 Mich. App. 517, 522, 655 N.W.2d 779, 783 (2002). "The unclean-hands doctrine is a self-imposed ordinance that closes

the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . . ." *New Prod. Corp. v Harbor Shores BHBT Land Dev., LLC*, 331 Mich. App. 614, 627, 953 N.W.2d 476, 484 (2020) (cleaned up). "Any willful act that transgresses equitable standards of conduct is sufficient to allow a court to deny a party equitable relief." *Ibid.*

The Agent maintains that JVIS-USA's own conduct renders untenable its request for a declaration that the notes are unenforceable. It relies on *Yuille v. American Home Mortgage Services, Inc.*, 483 F. App'x 132 (6th Cir. 2012) (*per curiam*) to support that argument. In that case, the plaintiff obtained a substantial purchase money loan secured by a mortgage on his residence. *Yuille*, 483 F. App'x at 133. When the plaintiff defaulted, the bank began foreclosure proceedings. The plaintiff then sued the mortgage company seeking, among other things, to quiet title to his property and to declare that the mortgage on his home was unenforceable. *Id.* at 134-35. In addition to finding against the plaintiff on the merits of his claim, the trial court concluded that the plaintiff could not obtain relief because he had unclean hands. The court of appeals affirmed, observing that the plaintiff "received $3.6 million in exchange for the note and mortgage, failed to pay that debt as he agreed, and then sought judicial assistance in avoiding his contractual obligations." *Id.* at 135. The Agent argues that JVIS-USA is trying to do the same thing, but *Yuille*'s facts are not a perfect fit for the facts of this case.

The plaintiff here never loaned JVIS-USA any money, and, based on the ensuing characterizations of the notes, neither did Winget or the Trust. Instead, JVIS-USA authorized distributions of several years to Winget (or the Trust), which Winget left in the company. JVIS-USA enjoyed the benefit of Winget's largess, but it need not have issued the distributions to begin with, and the transactions treating them as such gave Winget nothing more than the privilege of paying taxes with nothing in his pocket but I.O.U.s. JVIS-USA was not a party to the ongoing

litigation between the Agent and Winget.  When it sought to test the validity of the notes after being hailed into the fray, and upon being presented with the prospect that the notes were to be characterized as distributions, JVIS did not act inequitably or in bad faith in the same manner as the *Yuille* plaintiff.

JVIS-USA has long insisted, with substantial evidentiary support, that the notes represent the cash Winget would have received and has suggested they memorialize that pre-existing debt. Although this argument eventually was rejected, *see JPMorgan Chase Bank, N.A. v. Winget*, No. 21-1568, 2022 WL 2389287, at *6-7 (6th Cir. July 1, 2022) (stating that the promissory notes included integration clauses that foreclose that argument), it was not inequitable of JVIS to ask the Court to consider it or  to change theories when it didn't succeed.

The Agent also contends JVIS acted inequitably in light of evidence suggesting that it only sought to avoid the notes when it became clear that they would be obtained by the Agent and not payable to Winget.  It cites evidence, reflected in privileged documents admitted at trial, of a memorandum authored by Winget's attorney dated June 16, 2020, where counsel wrote that Winget could call the notes "immediately," monetize them through "available cash and property from JVIS" and invoke a security agreement over JVIS-USA's property to cover any deficiency. *See* Ex. 140.  Counsel ultimately advised against this strategy because he believed the Agent eventually could obtain the "cash and property into which [the notes] were monetized." *Ibid.* The "better alternative," he advised, was to "extend [the notes'] due dates out to 2023" to "prevent Chase from being able to call them immediately." *Ibid.* The Agent also cites another memorandum, discussed earlier, from the attorney dated June 3, 2020 that suggests amending notes to "thwart[], for at least the next 3 years, Chase's ability enforce the notes." Ex. 106.  That is powerful evidence on motive, but not of bad faith.  The memo author is Winget's attorney, not

JVIS-USA's.   The Agent also points to materials in the privileged documents from JVIS's attorneys: an email prepared by Robert D. Mollhagen, an attorney for JVIS-USA, regarding a security agreement and UCC filing that provided Winget a security interest in all tangible and intangible property of JVIS-USA.  *See* Ex. 107.  The attorney commented that "it may be prudent to rescind the loan and security agreement at this juncture" because the Agent "may try to claim it is also entitled to the security interest."  *Ibid.*   The Agent observes that the UCC Financing Statement was not renewed.

This evidence establishes that JVS-USA was doing whatever it could to preserve its business in the face of the looming enforcement of a debt obligation that formerly was in friendly hands, but that turned sinister through unanticipated legal developments.  But it is not evidence of bad faith or unclean hands.  And it is a far cry from the bite-the-hand-that-feeds scenario in *Yuille*.  JVIS's managers both testified that Mr. Winget had never demanded payment on any notes issued to his companies.  With the notes in the Agent's possession, JVIS-USA found itself in a contract with a different counter-party than it had initially anticipated.  Testing the validity of the notes when the Agent demanded payment, under the circumstances presented by the evidence, does not show that JVIS-USA's counterclaim is tainted with inequitableness or bad faith.

## H. Partial Invalidity

Plaintiff Alter Domus also has asserted that even if the promissory notes were unlawful when issued, JVIS nevertheless should be held responsible for the amounts that could have been distributed without violating the statute.  Some of the provisions of the Michigan LLC Act hint at that nature of a remedy of that nature.  *See* Mich. Comp. Laws § 450.4307(5) (permitting an LLC to make a payment to a withdrawing member of "[t]he portion of the obligation that could have been distributed without" rendering the LLC insolvent); *id.* § .4308(1) (providing for liability

against members and managers for unlawful distributions who assent to unlawful distributions "for the amount of the distribution that exceeds what could have been distributed without violating . . . section 307"); *id.* § .4308(3) (similar). But no statutory provision clearly is applicable to the circumstances here. The equitable remedy JVIS-USA has sought is the voiding of the notes in their entirety. *See Kukla v. Perry*, 361 Mich. 311, 324, 105 N.W.2d 176, 183 (1960) ("[W]here an illegal contract is involved, the court will not enforce it or grant relief thereunder . . . ."); *Krause v. Boraks*, 341 Mich. 149, 155, 67 N.W.2d 202, 205 (1954) ("All contracts which are founded on an act prohibited by a statute under a penalty are void although not expressly declared to be so and neither law nor equity will enforce a contract made in violation of such a statute." (citation omitted)). To the extent the Agent argues that one of the notes should not be determined valid, it has adduced no evidence demonstrating the order in which Winget and JVIS-USA executed the notes, that is, whether they executed the $135 million note or the $15 million note first. Absent that evidence, the Court cannot conclude that a remedy other than invalidating both notes is appropriate.

## III. Conclusion

Plaintiff Alter Domus is the real party in interest and has constitutional standing to pursue its claims. It has proved its breach-of-contract and MUVTA claims by a preponderance of evidence, but it may not enforce the promissory notes at issue here because the notes were illegal distributions under section 307(1)(b) of Michigan's Limited Liability Act, Mich. Comp. Laws § 450.4307(1)(b). Counter-plaintiff JVIS-USA has proved by a preponderance of the evidence that it was insolvent under Michigan Compiled Laws § 450.4307(1)(b) when it issued the two promissory notes on June 29, 2017 because its total assets were less than the sum of its total

liabilities as of that date.  The JVIS-USA is entitled to a declaration under its countercomplaint that the notes are void and unenforceable.  The complaint will be dismissed with prejudice.

Accordingly, it is **ORDERED** that the plaintiffs' complaint is **DISMISSED WITH PREJUDICE**, and the counter-plaintiff will be awarded relief on its counterclaim.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   September 30, 2025